Today's cases will be called as previously announced. The times will be allotted to counsel. The first case today is number 24-1311, United States v. Mark Anthony Figueroa. At this time, would counsel for the appellant please come to the podium and introduce himself on the record to begin. Good morning, your honor. May it please the court, David Nathanson for Mark Figueroa. With me is attorney Donya Fullerton who is on the brief. I hope to reach both issues today, the Magana torture testimony and the improper overview testimony. So just jumping right in. As I was preparing for argument, I began by rereading the government's brief and I started with the table of contents as one does and very helpful offense facts, a bunch of subsections, transactions. You know and that's right because torture was not an offense fact. It was not related to this offense. This should have been a case about financial transactions, the meaning of certain phrases, visits to certain locations, patterns, documents. What it was about is whether it was about drug dealing, right, or restaurant receipts. That's what the case was about, right? Absolutely, yes. And so Mr. Magana, if he's a drug money launderer, that makes it more likely that the transaction between the defendant and Mr. Magana were about drugs. Do we agree so far? Yes, your honor. He was beaten up, tortured, whatever label we're going to place on it, by a Sinaloa cartel member. Therefore, that that's, and he owes, one more step, he owes a debt to that person and he's engaging in transactions in large amounts of money that the defendant is dealing with him. Doesn't that make it more likely that these are drug transactions and not some other kind of transaction? So the answer is yes, but minimally, and that's why this is a more prejudicial than probative argument. It's 403B, right? Because... Do you agree that this is a plain air standard over you? I do not. It seems like the wording of the court was, we think that's certainly appropriate. There is no allegation that the defendant was personally involved in that. And the defense counsel said, I think there will be an objection, though, judge, to being kidnapped and things like that. And then the court said, well, what I would do is give a curative instruction at that point to the jury saying that there's no allegation. That doesn't sound very definitive in my mind that that was intended to be a final resolution. So there are two things I want to say about that. So what your honors just laid out is in our addendum at page three, to me, the judge is making clear that it's coming in because what he says to counsel is, look, the best you're going to get if this comes in is a limiting instruction. And the focus on the word think, I think, is a bit overly formal because that's how people speak. I think there's going to be an objection, judge. And in addition, the government says, well, counsel didn't object. And it's evidenced by the fact that he used it in crossing, used it in closing. But he doesn't have to unilaterally disarm to have preserved it previously. No, but it goes to, was it a strategic choice to have done that or not? I mean, that's what that goes to, right? So he says, I think I'm going to do something. But time goes by and lawyers are always making choices. And so how are we supposed to figure out what that really was? And it's informed by the fact that it becomes a helpful argument at the end to discount Magana. So I understand what your honor is saying, but I think, I think that ignores how people speak. When you're talking to a judge, you're trying to be respectful and you're trying to advance your case at the same time. And I think that's what counsel was doing here. And this judge, but this is, this is sort of an exception to the rule, right? The rule, this is an in limine kind of thing. And the general rule is you object in trial when it happens. And so we're questioning, should we use the exception, which is when it's definitively resolved. And so if a defense lawyer wants that exception to apply, it seems to me, he really needs to make that clear because it's the exception. The rule is object when it happens. So, right. I think the most determinative part of that is when the trial judge says, you know, you're going to get a limiting instruction. To me, that's making clear. What were the words he actually said though? So he said, what I would do is give a curative instruction at that point to the jury saying there's no allegation the defendant was involved in any plot to kidnap this witness or anybody else. Okay. So that's your best, the best record evidence we have to suggest that this was a definitive ruling that I would give if this thing happened. Right. And you know, the rule specifically requires the attorney, if there's doubt, to clarify whether it is a definitive ruling. I mean, it's right in the rule. So I believe that the tenor of Judge Stern's rulings all throughout were quite definitive. And he, he made it clear to counsel that he wasn't particularly interested in hearing more than the word objection. And so I think when, once they've hashed it out in front of Judge Stern's, I think everybody can fairly rely on what he's already said, that this is the way it's going to be. But I, if I may. Turn back to the, to the merits of this, which is whether it's abuse of discretion or plan error, the question still is, you said to me in my first question, okay, we're not making a 401 argument, we're making a 403 argument. So my question is, it's clear that the defendant's not the person doing the abusing, right? And so what, what about this would, would tar the defendant in a way that's prejudicial? This other guy was beat up by Sinaloa drug cartel members. It's pretty clear the defendant's not involved. So why is that prejudicial? Okay. There's two things I want to say. So, so the, the first part is that the prosecutor's closing, page 120 of that transcript, it explicitly makes that link, right? Which is that it's Figueroa to Magana to Rojo, Rojo the torturer. It, it's gripping. Did you add the last part of that, Rojo the torturer? Well, because Rojo's a drug dealer and that's what the case is all about. And, and it's the prosecutor's word, torture. And the description of what happened is that he's brought to a house with prison bars on it. He's beaten until some sort of board breaks. Your life belongs to us. And I think the prosecutor fairly described it as torture. So it's gripping it, even if it, if it doesn't in the cold light of day, making that explicit link to Figueroa, him having truck with these bad guys, it smears him. That's why it's a 403B argument. Well, he has truck with the guy who was beat up, not with, I mean, Magana's his right to get, but I mean, it's, it's downstream. I mean, yes, he's ultimately getting the drugs from those people, but there's no like real connection established that he's part of the Rojo violence machine in, in the cold light of day. That's true, but that's not how the prosecutor used it in closing. Right. That, that's what I would say. Can I ask you quickly about, I think it's O'Shaughnessy's testimony. Yes. And the government's position in their brief is some of that testimony, some limited parts of it were admitted in error, right? But then they say, but harmless. What are we, what is your position on that testimony, the specific testimony that the government says was admitted in error and should not have been admitted in the trial? Right. So there's Hernandez and O'Shaughnessy. So O'Shaughnessy is important because he's early in the case. Hernandez is later. And both of them fill in the gaps in the, in the evidence. They're, they're testifying to a key contested issue, which is whether this is drug money. O'Shaughnessy says that Figueroa was a drug trafficking organization supplier. He's working in cohort with the, the cell head, Cabojo Acosta and another trafficker, Estrella. That's not established by the evidence otherwise. So that's, that's pretty key. Hernandez is even more bald. He says that the money he gave me, those were drug proceeds. Again, he's going to the ultimate issue. And so government says, well, that could be understood. The jury would understand what he's saying there because the record evidence that clearly the agent doesn't know that as a fact he would know, but he, the facts on which he's basing that opinion are sort of laid out. So the prejudice there is kind of hard to see would be, I think the response. So I don't think that that's correct. And the reason is because of the imprimatur of authority, right? These are the guys that worked on this case. They know the jury has a, um, a tendency to defer to authority. This is just the way, you know, life works. Um, no matter how much we would like them to be inherently skeptical, these are the guys who put their lives on the line to, you know, to work this case and solve it. That's how it works. Um, so I just wanted to go back to the first issue just for one second, and then continue on. Well, very quickly, because your time is up in two seconds. Oh, so, um, we are entitled to raise plain error in the reply brief, being cited in our reply brief. Um, we did not waive that issue. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the government please introduce himself on the record to begin? Good morning, and may it please the court, Donald Lockhart for the government. Um, unless the court has different preference, I'll start with the Magana testimony issue first. Uh, the way that asked you to pick up on where, um, your colleague left off or your opponent left off, is this Perez or is it different because, um, of the imprimatur of authority that those Hernandez and, uh, O'Shaughnessy had? Well, I mean, it's a relevant factor. There's no question about it. Um, we're conceding that the first three portions of O'Shaughnessy's testimony were plain error. It's important to, uh, note in that regard, however, that the, uh, part that's with respect to Coboy Acosta stands on a somewhat different footing than the other two pieces. This is a factual question. Who were those guys in relation to what happened in this case? So Coboy Acosta, uh, as the record shows from our, from our brief in the offense facts section, was actually a partner with this defendant in the drug deal. You see them talking, for example, Coboy Acosta before one of the money drops says, how much are you delivering today? Uh, the defendant responds a hundred, meaning a hundred thousand dollars. There's a later discussion between the two of them about a huge bag of pills that's in a photograph in a WhatsApp exchange between the two of them and the two are talking about how much are we going to make from these pills. There's also evidence in the defendant's phone connecting him to FedEx packages, uh, that also concern Coboy Acosta. So Coboy Acosta is firmly linked into, uh, the conspiracy here. Uh, and we understand that under this court's, um, uh, uh, impermissible overview testimony case law, that in itself is not dispositive. The fact that we ultimately put in evidence on the point doesn't, um, doesn't necessarily answer the question of whether something is impermissible overview testimony, but it's certainly number one, relevant to that question. And number two, more importantly, uh, relevant to the question of prejudice. The court has made clear that when we... So the council is saying that, but for those statements that there would not be other evidence, uh, connecting, uh, the money to the drugs. Well, so that we, uh, obviously we disagree with that. We are overarching, uh, position here on overview testimony is that there is just overwhelming evidence, uh, showing that this, uh, money, the money that's being laundered as part of these videotape money drops involving this defendant is in fact drug proceeds. First of all, notice that this defendant was caught red-handed in six videotaped money drops. Two of those actually involved seizures directly from him. There's the undercover money drop where the officers take the hundred thousand from him. There's the drop where the trooper, uh, takes, uh, the money from him. So he's firmly connected to those drops. Uh, the only question is... Money. He's definitely connected to the money, but is the money connected to the drugs? I'm just leading up to my point, Your Honor. And I would submit that several factors show that this is drug proceed money. First of all, we have the July, 2019 recorded call in which the defendant describes his whole line running from Mexico up across the Arizona border and up to Boston. And he even talks in that conversation about how the price per kilo goes up and up and up the further north you go. Uh, up in Boston, by the, he gets it for 14,000, he says, down in Micho. By the time it's up in Boston, it's around 28 to 30. Uh, you have the April, 2020, uh, money drop involving the undercover officers as part of which the defendant says, I don't just deal in cocaine, perico, I deal in everything. Uh, I'm a, I am a factory, he says. So he's a drug dealing factory by his own admission on videotape as part of that money drop. Uh, second, third point is Magana's, uh, testimony connecting all of this stuff back to Rojo, Frank Cruz, uh, the Sinaloa, uh, drug cartel. The next thing is the defendant's phone. What's on the phone? All the data that connects them, number one, to the packages that are coming up from Tucson and Nogales, uh, the connection to the FedEx drivers who are taking packages that appear to be destined to people at Harvard University, but actually contain drugs and then they're diverting them, uh, to the drug dealers. Multiple, multiple connections from defendant's phone to those, uh, corrupt FedEx drivers. Against that, the two, so one guy you said is involved in the deals with him or involved in the drug activity with the defendant, the first, the guy you've already described. And then there's two other people that the data said, right, were cell DTO members. What, what's their role? Those other two. So there's no trial. We concede in the brief that there's no later trial evidence introduced with respect to those two men. There's the briefest of mentions by special agent O'Shaughnessy of the two other guys who I think you're talking to. Is there any discussion of what they're doing, how they relate? No, there's no, there's no discussion by O'Shaughnessy other than just sort of the bare description that these are two guys who are basically in a DTO with the defendant. There's nothing further on that. And what he says, O'Shaughnessy is that, um, they piece this together from data extracted from the defendant's phone. And the problem of course, is that although we put in data from that phone that ties the defendant to drug dealing with Coboy Acosto, the, the phone data that, uh, that the agent speaking of with respect to these two other guys did not come into evidence. So, and that's, and that's one of the, the, the reasons why we're conceding that those two portions are, um, are plain error. But you know, the list goes on to Judge Thompson's point. We also have the defendant's incriminating statements that he made upon, um, arrest in which he just flatly denies, uh, anything having to do with any of these money drops, even though he's caught on videotape and, and he's, uh, and two of these, uh, drop moneys are actually seized, uh, from him. He comes up with a story about Bitcoin mining. Uh, the, these are all powerful indicators of consciousness of guilt. And then we have just the overarching evidence showing a very elaborate system as part of which they're using, uh, couriers instructed by Magana to get money, uh, up to Frank Cruz or down to Frank Cruz in Mexico. Um, and they're using the dollar bill identification numbers, uh, you know, all this surreptitious activity, uh, for restaurant receipts, for, for Bitcoin transactions, it's implausible. Before you run out of time, because you, you've given us quite a bit as far as a response, but before you run out of time, could you tell us why, uh, the defendant wasn't substantially prejudiced by the, uh, torture? Right. So I think we've, uh, there's been a lot of discussion about the relevance of that, uh, testimony and, and I'll talk about that, uh, if you'd like, but I'd like to skip just for a second to the prejudice piece and address that one head on because, um, there's no suggestion either in the government's closing arguments or in the presentation of the evidence that, um, that Magana, uh, that this defendant has anything whatsoever to do with this beating that occurs down in Mexico. We don't try to link him to that at all. There's no suggestion that he's engaged in similar activity. The testimony comes in rather briefly. It's about five pages and only about two or three sentences in the mix actually concern the beating with the paddleboard, uh, which is not graphically described. There's no description of the injuries that, um, that, uh, Magana sustained. And wouldn't a jury think that he's a main cog in an operation that engages in torture, that he's permits it just by his participation in it? Uh, no, we, we don't think so, Your Honor. Uh, I mean, there would be a concern, I think if the government somehow leveraged it in that direction or if the, the evidence sort of, uh, made a connection, uh, between him and, and the beating and the kidnapping, but it didn't. And remember the defense itself is emphasizing that this took place a full six months before the first money drop involving the defendant. Um, so there's, there's this point was in the closing, I think that they sort of said this is a really dangerous drug organization because Rojo is a torturer and that sort of tars Figueroa because he's now part of that and that should be concerning because the jury might've been, you know, influenced by the sort of violent nature of the DTO that we're talking about. Right. That's the argument, uh, Your Honor. But if you look at record appendix page 471, which is the page that the defendant cited or defense counsel cited page 120 of the transcript, the actual, the record appendix page is 471. Uh, for what he's saying, if you look at that page, you're not going to see any connection to, uh, Figueroa there. It's, it's a description about why this is centrally relevance, relevant to showing, uh, that the, the pro the drug drop money that we're talking about for these transactions is in fact drug proceeds. Remember on the relevance point, it's crystal clear that this is central to the case for reasons we've discussed in the brief. Um, just to hit their last point, do you agree when they argue plain error in the reply brief that's sufficient? Uh, on the Pabon waiver? Yes, but it's reviewed for plain error because the district court's ruling was entirely provisional. That's a different argument. Yes. Correct. They, they've now cured the Pabon waiver through their reply brief. If I could just ask you a question out of curiosity, are, are during voir dire these days, are jurors being asked as to whether they saw Breaking Bad? I don't know. I'm familiar with the cultural reference. I didn't, uh, totally understand Judge Stern's remark in that regard, but we emphasize the remark to show that it was a provisional ruling, right? Because he's saying, look, Magana can tell his own story as long as it's relevant to what we are doing. And it sounds like it might be a kind of Breaking Bad interest as the story unfolds. And that, I mean, those are the words which I think encapsulate the point that this is an entirely provisional ruling. Um, but exactly what he was at with Breaking Bad, I can't tell you. I've never seen the show. Thank you. A lot of jurors have. Yeah. Thank you. Thank you. Thank you, counsel. That concludes argument in this case.